**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **PAUL S. SLINSKI**<br>**and SARAH J. SLINSKI,**<br><br>　　　　　　**Plaintiffs,**<br><br>**v.**<br><br>**BANK OF AMERICA, N.A.** *et al.*,<br><br>　　　　　　**Defendants.** |

**Civil Action 11-720  (RC)**

## MEMORANDUM OPINION

Sarah Slinski had a contract to buy the condominium in which she lives from Freddie Mac, which acquired the property in a foreclosure sale. She applied to Bank of America for a home mortgage. While her mortgage application was pending, Freddie Mac apparently sold the property to Bank of America. Ms. Slinski and another plaintiff brought suit alleging breach of contract and other theories of recovery. Many—but not all—of their claims will be dismissed.

## I.  BACKGROUND

Paul and Sarah Slinski allege that, in August 2009, Ms. Slinski leased a condominium on Vermont Avenue, near U Street in Washington, D.C. Her landlords held the property subject to a deed of trust benefitting Bank of America, N.A. ("Bank of America" or "the bank"). Am. Compl. ¶¶ 10, 13. In early February 2010 the bank installed new trustees, who promptly notified the landlords that their property would be sold at auction to satisfy their debt. *Id.* ¶¶ 14–15. That auction was held the following month, and Ms. Slinski was the high bidder. *Id.* ¶ 17. She executed a contract and paid a deposit, *id.*, but the sale was cancelled and her deposit returned, *id.* ¶ 18. The trustees sent another notice of foreclosure sale that May, and a second auction was

held in June. *Id.* ¶¶ 20–21. This time, the Federal Home Loan Mortgage Corporation ("Freddie Mac") was the high bidder and took title to the property. *Id.* ¶ 21. The plaintiffs allege, upon information and belief, that before Freddie Mac bid on the condominium it entered into an agreement with Bank of America in which the bank "agreed to repurchase the Property from Freddie Mac should Freddie Mac fail to sell the Property after a period of time." *Id.* ¶ 22. They further allege—also upon information and belief—that, as a result of this agreement, Freddie Mac became a "straw man" acting as an agent for its principal, Bank of America. *Id.* ¶ 23.

In October 2010, Smith Realty, Inc. Enterprise (acting on behalf of Freddie Mac) contacted Sarah Slinski to give her an opportunity to purchase the condominium in accordance with the District of Columbia Tenant Opportunity to Purchase Act, D.C. CODE § 42-3404.01 *et seq.* Am. Compl. ¶ 24. Ms. Slinski signed a contract to do so and paid a deposit of $20,000 to Smith Realty. *Id.*, Ex. 11; *id.* ¶ 26. The contract provided that Ms. Slinski and Freddie Mac would "make full settlement . . . on, or with mutual consent before, November 19, 2010." *Id.*, Ex. 11, ¶ 6. An addendum, which stated that it was to control in the case of any conflicts with the contract's main body, similarly provided that the closing would "occur on or before November 19, 2010, or within seven (7) calendar days of loan approval, whichever is earlier, unless the closing date is extended in writing signed by the Seller and Purchaser." *Id.*, Ex. 11, Addendum ("Addendum"), ¶ 4. It required Ms. Slinski to "apply for financing from a third party financial institution in the form of a first mortgage secured by the Property" and "accept a prevailing rate of interest at the time of closing." *Id.* ¶ 14.b. Ms. Slinski was given "five (5) business days from the final execution date of the Contract of Sale to make [a] loan application," and Freddie Mac was free to cancel the contract if Ms. Slinski was not "'prequalified' by a lender within seven (7) business days" from that date. *Id.* ¶ 15.

The addendum also provided that, "[i]n the event that either party fails or refuses to proceed to settlement for any reason" the "sole and exclusive remedy" would be "the recovery of liquidated damages in the amount of one thousand dollars." *Id.* ¶ 19. Both parties "acknowledge[d] and agree[d] that the economic consequences" of such a breach were "speculative and uncertain" and therefore "agree[d] to accept . . . liquidated damages as full and complete compensation for any and all claims, whether founded upon contract, tort, statute, or otherwise, that may arise in connection with the failure or refusal of the other party to proceed to settlement." *Id.* The parties "expressly waive[d] and disclaim[ed] any and all further claims and remedies including but not limited to injunctive relief, specific performance . . . and claims for monetary compensation." *Id.*

The plaintiffs allege, upon information and belief, that despite this contract Freddie Mac never actually intended to sell the condominium to Ms. Slinski. Am. Compl. ¶ 29.

Ms. Slinski applied to Bank of America for a home mortgage. *Id.* ¶ 30. When she submitted her contract with Freddie Mac, the bank informed her that she was not qualified for a loan to purchase the condominium and would require a cosigner. Paul Slinski cosigned the financing application, and the bank sent Sarah Slinski a mortgage loan commitment letter on that same day. *Id.* ¶¶ 32–34. On November 10, 2010, Bank of America sent Ms. Slinski a notice of approval, conditioned on her submission of certain information and documents. *Id.* ¶ 35.[1]

A series of delays ensued. On November 17, 2010, the plaintiffs allege that Ms. Slinski

---

[1] The plaintiffs allege that this and subsequent events occurred "on or about" the date provided. That ambiguity has been eliminated for ease of reference, and because nothing in the pending motions turns on the precise dates.

and Freddie Mac signed[2] an agreement pushing the closing date back to December 12. *Id.* ¶ 36. Bank of America sent Ms. Slinski another notice of conditional approval, requiring the submission of additional information and documents. *Id.* ¶ 37. The plaintiffs allege that Ms. Slinski and Freddie Mac rescheduled the closing for January 7, 2011, *id.* ¶ 38, then signed two more agreements: one set a new closing date of January 28, and the other a date of February 11, *id.* ¶ 41. They further allege that, during this period, Bank of America was intentionally delaying the approval of the mortgage with the knowledge that such a delay would prevent Ms. Slinski from closing on the condominium. *Id.* ¶ 42.

On January 28, Bank of America finally approved the loan to Ms. Slinski, with Mr. Slinski as cosigner. *Id.* ¶ 43. But the plaintiffs allege, upon information and belief, that by this time Freddie Mac no longer owned the condominium—Bank of America had bought it. *Id.* ¶ 44.

The following month, the bank informed the plaintiffs that it would sell the condominium to Ms. Slinski at the same price and on the same terms that Freddie Mac had agreed to, but that a new appraisal would be required before that sale could be completed. *Id.* ¶ 46. On March 9, the appraiser (who was also a real estate agent) contacted Ms. Slinski and offered her the opportunity to buy the property for a substantially higher price than Freddie Mac had agreed to. *Id.* ¶ 47. On March 15, Bank of America informed Ms. Slinski that there was no longer a valid contract for the sale of the condominium. *Id.* ¶ 51. On March 17, the bank sent notices to the

---

[2] Freddie Mac disputes the allegation, noting that the agreements attached as exhibits to the complaint are only signed by Ms. Slinski. Def.'s Mot. [Dkt. # 30], at 13. In their opposition, the plaintiffs respond that Smith Realty, acting as an agent for Freddie Mac, executed the extension agreements, and that Freddie Mac accepted the extensions by not terminating the contract. Pls.' Opp. [Dkt. #31], at 11–12. Freddie Mac replies that such an agency relationship is not adequately alleged in the complaint, nor supported by the documents attached to it. Def.'s Reply [Dkt. #35], at 7–8.

former owners of the condominium and to Ms. Slinski, demanding that they vacate the property. *Id.* ¶ 52. On March 22, Bank of America terminated Ms. Slinski's mortgage application. *Id.* ¶ 53. The plaintiffs brought suit in Superior Court on March 24.

After Freddie Mac removed the case pursuant to 12 U.S.C. § 1452(f), the plaintiffs amended their complaint, naming Bank of America, Freddie Mac, Fairfax Realty (which employed the appraiser), and Smith Realty as defendants. Freddie Mac and Bank of America have both moved to dismiss the complaint for failure to state a claim on which relief can be granted. All claims against Fairfax Realty have been dismissed with prejudice. Smith Realty has apparently never been served.

## II. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Such motions allege that a plaintiff has not properly stated a claim; they do not test a plaintiff's ultimate likelihood of success on the merits. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). The complaint is only required to set forth a short and plain statement of the claim, in order to give the defendant fair notice of the claim and the grounds upon which it rests. *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (citing FED. R. CIV. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A court considering this type of motion presumes the factual allegations of the complaint to be true and construes them liberally in the plaintiff's favor. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). It is not necessary for the plaintiff to plead all elements of his prima facie case in the complaint, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14 (2002), or to plead law or match facts to every element of a legal theory,

*Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) (internal citations omitted). Nonetheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007). A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).

The court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004); *Browning*, 292 F.3d at 242. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## III. ANALYSIS

### A. Breach of Contract (Counts I & II)

In the first two counts of their complaint, the plaintiffs allege that both Freddie Mac and Bank of America breached the contract of sale between Freddie Mac and Sarah Slinski. The first count seeks specific performance of the contract, while the second demands damages for the breach. Freddie Mac and Bank of America have moved to dismiss those counts.

### i. Freddie Mac

### a. Liquidated Damages

Freddie Mac argues that specific performance and damages in excess of one thousand dollars are barred by the contract's liquidated damages clause which provides, in pertinent part, that "[i]n the event that either party fails or refuses to proceed to settlement for any reason" the injured party's "sole and exclusive remedy" is "the recovery of liquidated damages in the amount of one thousand dollars." Addendum ¶ 19. In that clause, the parties "expressly waive and disclaim any and all further claims and remedies including but not limited to injunctive relief, specific performance . . . and claims for monetary compensation." *Id.*

"Under District of Columbia law, liquidated damages clauses are valid and enforceable." *Ashcraft & Gerel v. Coady*, 244 F.3d 948, 954 (D.C. Cir. 2001); *accord Horn & Hardart Co. v. Nat'l Rail Passenger Corp.*, 843 F.2d 546, 550 (D.C. Cir. 1988). "[A] bargained-for liquidated damages clause is valid unless it is found to constitute a penalty." *Burns v. Hanover Ins. Co.*, 454 A.2d 325, 327 (D.C. 1982); *accord Order of AHEPA v. Travel Consultants, Inc.*, 367 A.2d 119, 126 (D.C. 1976). "The standard in this jurisdiction for determining whether a provision for [liquidated] damages should be construed as a penalty is set forth in *Davy v. Crawford*." *Order of AHEPA*, 367 A.2d at 126. In *Davy*, the D.C. Circuit explained that:

> In order to determine whether or not the provision should be construed as a penalty the contract must be construed as a whole as of the date of its execution. If under the circumstances and expectations of the parties existing at the time of execution it appears that the provision is a reasonable protection against uncertain future litigation the provision will be enforced even though no actual damages were proved as of the date of the breach. If, on the other hand, it appears that the stipulation is designed to make the default of the party against whom it runs more profitable to the other party than performance would be, it will be void as a penalty. Thus, damages stipulated in advance should not be more than those which at the time of the execution of the contract can be reasonably expected from its future breach, and agreements to pay fixed sums plainly without reasonable relation to any probable

damage which may follow a breach will not be enforced.

147 F.2d 574, 575 (D.C. Cir. 1945) (citations omitted); *see also Red Sage Ltd. P'ship v. Despa Deutsche*, 254 F.3d 1120, 1126–27 (D.C. Cir. 2001); *Order of AHEPA*, 367 A.2d at 126 (both quoting this passage in its entirety).

Because the enforceability of a liquidated damages clause is determined by reference to the "circumstances and expectations of the parties existing at the time of [the contract's] execution," *Davy*, 147 F.2d at 575, the issue is often resolved at summary judgment or after trial, when evidence of those "circumstances and expectations" is before the court. *See, e.g.*, *Red Sage*, 254 F.3d at 1130 (summary judgment); *Ashcraft & Gerel*, 244 F.3d at 950, 956 (post-trial judgment); *Cuneo Law Grp. P.C. v. Joseph*, 669 F. Supp. 2d 99, 113–17 (D.D.C. 2009) (summary judgment); *S. Brooke Purll, Inc. v. Vailes*, 850 A.2d 1135, 1136, 1140 (D.C. 2004) (bench trial); *Vicki Bagley Realty, Inc. v. Laufer*, 482 A.2d 359, 364 n.12, 368 (D.C. 1984) (bench trial).

In their opposition, however, the plaintiffs make only a single legal argument: that the liquidated damages provision is void as an unenforceable penalty because the same damages would apply in the case of any breach, no matter the reason or the severity. The plaintiffs note that the *Davy* court did not enforce a liquidated damages clause under which "a minor and insubstantial default on the part of the tenant would become highly profitable to the landlord." 147 F.2d at 575.

The contract at issue in *Davy* was "a lease of a dwelling house with an option to purchase at a set price." *Id.* Rent was $54 a month, credited against the purchase price if the option was exercised. The down payment of $640, which was "stated to be compensation for the option to purchase and also liquidated damages for failure to exercise it," was forfeited, and the option

voided, if the tenant breached any covenant in the lease and the landlord chose to retake possession.  *Id.*  Those covenants, moreover, were "so strictly drawn that the slightest slip on the part of the tenant [would] cause him to lose his entire equity."  *Id.*  If the tenant was ever late with the rent "for any reason whatever," or failed to pay the gas, electric, or water bills promptly, or did not keep the property in good condition, then the landlord could retake the property without notice, retain the entire down payment (which amounted to nearly a year's rent) and cancel the purchase option, depriving the tenant of "all . . . valuable interest in the option to purchase which [he] may have built up by payments over a period of years."  *Id.*  "Under these circumstances," the *Davy* court said, "a minor and insubstantial default on the part of the tenant would become highly profitable to the landlord."  *Id.*

The plaintiffs have not identified any analogous circumstances here.  To begin with, the liquidated damages clause in Ms. Slinski's contract only applies to a single type of breach: the failure or refusal by either party to proceed to settlement.  Although the plaintiffs suggest that, as in *Davy*, "the damages applicable to a major breach would also be applied to a 'minor [and] insubstantial default,'" Pls.' Opp. [Dkt. # 31], at 8, it is hard to understand what they mean by that.  Either a party proceeds to settlement (thereby performing on the contract of sale) or it does not (thereby breaching).  There are no covenants in this contract which would, like those in *Davy*, be susceptible of "a minor and insubstantial default."  Similarly inscrutable is the plaintiffs' suggestion that because the liquidated damages provision "applies a default for any reason and based on any grounds, and does not take into account the differing degrees of damages associated with varying reasons or grounds" it is therefore unenforceable.  Pls.' Opp. [Dkt. # 31], at 9.  This argument also borrows language from *Davy*, but misses its point once more.  The *Davy* court noted that late payment of rent "for any reason whatever" was a breach of

contract which the tenant was not entitled to cure, and marshaled this fact toward its conclusion that the contract as a whole had an "unconscionable and overreaching character."  147 F.2d at 575.  In allowing for the confiscation of a year's rent and all equity if payment was ever a day late—even if the tenant was incapacitated, or mourning, or could assert some other extenuating circumstance—the contract was impermissibly strict.  It was this strictness, and not the lack of variable damages, to which the *Davy* court objected.  The plaintiffs do not suggest that Ms. Slinski's contract had a similar character, nor (in any event) do they explain how their damages would differ depending on *why* Freddie Mac refused to close.

The plaintiffs also object to the fact that the liquidated damages clause "provides for one minimal sum of money [to be] payable as damages for any breach."  Pls.' Opp. [Dkt. # 31], at 9.  The reference to "any breach" is, again, hard to square with the clause, which only applies to a failure or refusal to proceed to settlement.  *Cf. Ashcraft & Gerel*, 244 F.3d at 955 (enforcing liquidated damages provision where any "material" breach triggered a set payment).  As for the "minimal sum of money," the D.C. Court of Appeals has rejected the argument "that because the actual damages incurred . . . exceeded the stipulated sum, [a liquidation clause is] unreasonable and therefore unenforceable," *Burns*, 454 A.2d at 327, and has said that it was unaware of "any case where a liquidated damages clause was found unenforceable because the damages provided were disproportionately low in relation to the actual damage incurred," *id.* at 327 n.1; *see also Red Sage*, 254 F.3d at 1128 (enforcing a liquidated damages provision that "does not guarantee . . . a certain windfall in case of a breach"); *Ashcraft & Gerel*, 244 F.3d at 955 (quoting the Restatement (Second) of Contracts § 356(1) for the proposition that "[a] term fixing *unreasonably large* liquidated damages is unenforceable on grounds of public policy as a penalty" (emphasis added)); *Vicki Bagley*, 482 A.2d at 368 n.22 (applying the rule that

"[d]amages stipulated in advance should not be *more than those* which at the time of the execution of the contract can be reasonably expected from its future breach" (quoting *Burns*, 454 A.2d at 327 (quoting *Davy*, 147 F.2d at 575)) (emphasis added)).  Neither does this court know of any case that has invalidated a liquidated damages provision because the damages that it stipulated were unreasonably small.

"[T]he interpretation of a contract provision is a question of law and not of fact," *Vicki Bagley*, 482 A.2d at 366, and therefore, so long as the terms of that provision are "reasonably clear," its construction is "a problem for the court, not the jury," *Clayman v. Goodman Properties, Inc.*, 518 F.2d 1026, 1034 (D.C. Cir. 1973); *accord Burns*, 454 A.2d at 328 ("Interpretation of a contract provision is a question of law for the court to decide . . . .").  The plaintiffs argue that the liquidated damages clause is invalid as a matter of law because it provides one thousand dollars as compensation for any breach, no matter the reason or severity, which is (the plaintiffs say) far too little.  But a clause that fixes a single sum for any material breach is not invalid, *Ashcraft & Gerel*, 244 F.3d at 955, nor have the plaintiffs provided any authority holding that liquidated damages are void where the stipulated sum is unreasonably small.  The court does not see how the reason for the breach can matter here.  Because the plaintiffs' only argument against the clause is unavailing, and they do not suggest (and with their silence waive any argument) that it is premature to resolve the question on a motion to dismiss, the court will grant Freddie Mac's motion to dismiss the plaintiffs' claims for specific performance and damages in excess of one thousand dollars.  *See Concrete Sys., Inc. v. Pavestone Co.*, 112 Fed. Appx. 67, 69 (1st Cir. 2004) (per curiam) (upholding dismissal of a

failure-to-close claim for damages in excess of the liquidated sum).[3]

### b. Prior Breach

Freddie Mac further argues that the plaintiffs' claim for liquidated damages is barred by Ms. Slinski's own prior breach of the contract. Its theory is that because the contract required the closing to "occur on or before November 19, 2010, or within seven (7) calendar days of loan approval, whichever is earlier, unless the closing date is extended in writing signed by the Seller and Purchaser," Addendum, ¶ 4, and the extension agreements attached to the complaint are only signed by Ms. Slinski, *see* Am. Compl., Exs. 16, 18, 20–21, she therefore breached the contract when she did not close by the appointed date. As discussed above, *see supra* note 2, the plaintiffs respond to this argument by modifying the allegations in their complaint, arguing instead that Smith Realty, acting as an agent for Freddie Mac, executed the extension agreements, and that Freddie Mac accepted the extensions by not terminating the contract. Pls.' Opp. [Dkt. #31], at 11–12. Freddie Mac, in turn, argues that such an agency relationship is not adequately alleged in the complaint, nor supported by the documents attached to it. Def.'s Reply [Dkt. #35], at 7–8.

Of course, a "plaintiff may not amend her complaint by the briefs in opposition to a motion to dismiss." *Middlebrooks v. Godwin Corp.*, 722 F. Supp. 2d 82, 87 n.4 (D.D.C. 2010); *accord Perkins v. Vance-Cooks*, 886 F. Supp. 2d 22, 29 n.5 (D.D.C. 2012); *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 107 (D.D.C. 2004). The amended complaint alleges that the extension agreement were in fact executed by Freddie Mac. Am. Compl. ¶¶ 36, 38, 41. Although the court need not credit allegations that are contradicted by exhibits, *Kaempe v. Myers*, 367 F.3d 958, 963

---

[3] The liquidated damages provision does not, as Freddie Mac argues, bar a claim for the liquidated sum, nor require that a demand be made before suit can be brought.

(D.C. Cir. 2004), the existence of copies signed only by Ms. Slinski (who may have kept such copies before submitting the forms to Freddie Mac) does not prove that Freddie Mac never signed those agreements. Construing the amended complaint in the light most favorable to the plaintiffs, the court would accept the allegation that both parties agreed to extend the closing date and reject Freddie Mac's argument that damages are evidently barred by Ms. Slinski's alleged prior breach.

Were the court to consider the plaintiffs' revised allegations—that Smith Realty executed the agreements on behalf of Freddie Mac—it would reach the same conclusion for substantially the same reasons: the fact that the agreements attached to the complaint are signed only by Ms. Slinski does not prove that only she ever signed them, and it is hardly surprising that the amended complaint (which alleges that Freddie Mac, not Smith Realty, executed the agreements) does not go into detail about Smith Realty's authority to sign agreements on behalf of Freddie Mac.

Finally, whichever version of the allegations is now before the court, prior breach is an affirmative defense, *see, e.g.*, *Countrywide Servs. Corp. v. SIA Ins. Co., Ltd.*, 235 F.3d 390, 392 (8th Cir. 2000), and as such cannot be the basis of a motion to dismiss unless its validity is obvious from the face of the complaint, *see Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998). For the reasons discussed above, the defense is not obvious, and so the court must reject Freddie Mac's argument that damages are clearly barred by prior breach.

### c. Paul Slinski

Finally, Freddie Mac argues that Paul Slinski cannot assert any claims for breach of contract because he was merely a cosigner on the mortgage application, and not a party to the contract of sale nor a third party beneficiary of it. The plaintiffs reply that Mr. Slinski "is an

appropriate party to this lawsuit," but do not claim that he was a party to the contract or an intended beneficiary if it. Pls.' Opp. [Dkt. # 31], at 16. His breach of contract claims against Freddie Mac will therefore be dismissed. *See, e.g.*, *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1064 (D.C. 2008) ("In order to sue for damages on a contract claim, a plaintiff must have either direct privity or third party beneficiary status." (internal quotation marks omitted)).

### ii. Bank of America

Bank of America argues that the plaintiffs have not plausibly alleged any agency relationship between the institutions. Bank of America contends that, because of this failing, there is no reason to conclude (as the plaintiffs do) that the bank was a party to the contract between Sarah Slinski and Freddie Mac—and if the bank was not a party to the contract, then it cannot be liable for breach.

The complaint alleges that, before Freddie Mac bid on the condominium at the second foreclosure sale, Bank of America "agreed to repurchase the Property from Freddie Mac should Freddie Mac fail to sell the Property after a period of time, believed to be ninety (90) days." Am. Compl. ¶ 22. Accepted as true, this allegation does not support the conclusion that Freddie Mac was an agent for Bank of America, that the mortgage corporation was somehow acting on behalf of—and with authority to bind—the bank when it purchased the condominium. If Bank of America was acting through its agent when Freddie Mac bought the condominium at auction, the bank would have acquired ownership of the property then and there (though a formal transfer of ownership may have been required). *Cf., e.g.*, *Makins v. District of Columbia*, 861 A.2d 590, 593 (D.C. 2004) ("Agency principles are applied to determine whether the . . . agent had authority to bind his principal to the . . . contract."). Instead, the plaintiffs allege that Bank of

America agreed to buy the property from Freddie Mac if—and, necessarily, only if—Freddie Mac could not sell it after some period of time. That is an option contract, not an agency relationship. *See Stanwood v. Welch*, 922 F. Supp. 635, 640 (D.D.C. 1995) ("[A]n option contract can . . . take the form of a conditional contract to sell or buy.").

Nor are the complaint's references to Freddie Mac as a "straw man" with authority to act on behalf of the bank sufficient to support a plausible inference of an agency relationship. Am. Compl. ¶ 23. As relevant here, a "straw man" is "[a] third party used in some transactions as a temporary transferee to allow the principal parties to accomplish something that is otherwise impermissible." BLACK'S LAW DICTIONARY 1557 (9th ed. 2009). The plaintiffs do not explain why it would have been impermissible for Bank of America to simply purchase the condominium at auction, if it wished to do so.

The existence of an agency relationship is a legal conclusion, which the court need not accept unless it is supported by factual allegations. *See Warren*, 353 F.3d at 39; *Browning*, 292 F.3d at 242. This conclusion is not. Because Bank of America cannot be held liable on a contract to which it was never a party, the claims against the bank for contractual damages and specific performance will be dismissed.

### B. Tortious Interference with Contract (Count III)

The plaintiffs allege that, by repeatedly delaying the approval of Ms. Slinski's financing, Bank of America tortiously interfered with her contract with Freddie Mac. The bank has moved to dismiss this claim, arguing first that, on the plaintiffs' own account, Bank of America was a party to that contract—and a party cannot tortiously interfere with its own contract. *King & King, Chartered v. Harbert Int'l, Inc.*, 503 F.3d 153, 157 (D.C. Cir. 2007) (applying D.C. law). But the court has already rejected the theory that Freddie Mac was an agent for the bank

(because that theory was unsupported by factual allegations) and the plaintiffs explain that their tortious interference claim is pled in the alternative.

Bank of America's second argument is that, because the contract of sale was not contingent on Ms. Slinsi's ability to obtain financing, the bank's ostensible delays in providing that financing could not have caused the breach of contract, because Ms. Slinski remained free to close on the contract at any time. *See Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403 (D.C. Cir. 2012) (noting that D.C. law requires a plaintiff claiming tortious interference with contract to establish the "defendant's intentional procurement of the contract's breach" (quoting *Cooke v. Griffiths-Garcia Corp.*, 612 A.2d 1251, 1256 (D.C. 1992))). The plaintiffs reply, in essence, that even if the contract was not formally contingent on financing Bank of America knew that Ms. Slinski did not have the money to hand—and that refusing to finance the sale would therefore prevent it from closing. That makes perfectly good sense, and the bank does not cite any authority to the contrary.

Finally, the bank argues in a single sentence that it could not have tortiously interfered with the contract of sale if, as the plaintiffs allege, the closing date was continually rescheduled. But the extensions did not go on forever—at some point (again, as the plaintiffs allege) Freddie Mac breached the contract of sale and sold the property to Bank of America.

Although there may be other arguments against this claim, Bank of America offers none, and so the claim will not be dismissed.

### C. Tortious Interference with a Prospective Advantage (Count IV)

The plaintiffs have agreed to withdraw their claim against Bank of America for tortious interference with a prospective advantage, which the court will therefore dismiss.

### D. Fraud (Count V)

The plaintiffs allege that Freddie Mac committed fraud by misrepresenting its intention to sell the condominium to Ms. Slinski, and that Bank of America committed fraud by misrepresenting both its intention to finance that sale and its subsequent ownership of the property.

#### i. Freddie Mac

Freddie Mac moves to dismiss these claims on the grounds that the complaint does not allege fraud with the particularity required by Federal Rule of Civil Procedure 9(b). In this circuit, a plaintiff alleging fraud must "state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (quoting *Kowal v. MCI Commc'ns, Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994), in turn quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981)). The plaintiff must also "identify individuals allegedly involved in the fraud." *Id.* This heightened pleading standard "discourage[s] the initiation of suits brought solely for their nuisance value, and safeguards potential defendants from frivolous accusations of moral turpitude. . . . And because 'fraud' encompasses a wide variety of activities, the requirements of Rule 9(b) guarantee all defendants sufficient information to allow for preparation of a response." *Id.* (quoting *Joseph*, 642 F.2d at 1385) (alterations in original).

The only false misrepresentation that the plaintiffs identify is Freddie Mac's signing of the contract of sale which, they say, represented an intention to sell the condominium to Ms. Slinski, when in fact Freddie Mac always intended to sell it to Bank of America. Am. Compl. ¶¶ 129–30. The contract itself is evidence of the "time, place and content" of that representation,

as well as the individual who made it on behalf of Freddie Mac, but the plaintiffs do not specify "what was retained or given up as a consequence of the fraud."  Instead the plaintiffs argue that, because of Freddie Mac's alleged fraud, Freddie Mac did not sell the condominium to Ms. Slinski.  District of Columbia law accounts for the circularity of that argument by requiring "an independent injury over and above the mere disappointment of [a] plaintiff's hope to receive his contracted-for benefit" to support a claim of fraud.  *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008) (quoting *Tate v. Aetna Cas. & Sur. Co.*, 253 S.E.2d 775, 777 (Ga. Ct. App. 1979)); *accord Plesha v. Ferguson*, 725 F. Supp. 2d 106, 113 (D.D.C. 2010) ("District of Columbia law requires that the factual basis for a fraud claim be separate from any breach of contract claim that may be asserted.").  The plaintiffs have alleged no injury beyond the disappointment of Ms. Slinski's hope to purchase the condominium—which is the subject of their breach of contract claim.  Their claim for fraud against Freddie Mac will therefore be dismissed.

### ii.  Bank of America

Bank of America moves to dismiss the claims of fraud against it on the grounds that the plaintiffs have not alleged any false misrepresentation.  The bank argues that the first misrepresentation alleged—that the bank intended to finance the sale—is belied by the conditional nature of the financing offer.  As the bank points out, the offers (which are attached as exhibits to the complaint) state that they are conditional, and the plaintiffs do not allege that those conditions were satisfied.  Bank of America concludes that, because the plaintiffs neither allege any representation that financing would be extended if the conditions were not satisfied nor allege that the conditions in fact were satisfied, they have not alleged any fraudulent misrepresentation about the provision of financing.  The plaintiffs reply that the

misrepresentation consisted of "requiring a cosigner for the loan and conditionally approving the loan to Sarah Slinski on three separate occasions and ultimately failing to provide financing despite Plaintiffs' efforts to proceed to settlement." Pls.' Opp. [Dkt. # 32], at 13. That neither answers the bank's argument, nor sets forth any misrepresentation. (At most, it alleges a breach of contract to provide financing, which the plaintiffs have disclaimed. *Id.* at 10.) The claim based on fraudulent misrepresentation of intent to finance will therefore be dismissed.

Bank of America further argues that the plaintiffs' second allegation—that the bank fraudulently misrepresented its ownership of the property—is grounded in an erroneous belief that land records establish absolute proof of ownership. Unlike Freddie Mac, the bank takes issue not with the inconsistency of this allegation, but rather with its factual basis. For their part, the plaintiffs make clear that these records are, indeed, the basis of their alternative allegation that Bank of America does not own the property. *See* Am. Compl. ¶ 44 (alleging that Bank of America "has not yet recorded its deed from Freddie Mac); *id.* ¶¶ 139–40 (alleging that "the land records show Freddie Mac as record title owner of the Property" and concluding that Bank of America "misrepresented that Freddie Mac did not own the Property"); *id.* ¶¶ 162–63 (same); *id.* at 28, ¶¶ 6–7 (alleging that "[t]he land records . . . clearly show[] Freddie Mac holds title to the Property" and that "[t]here is a discrepancy between [Bank of America's] representation that it owns the Property and the land records which reflect that Freddie Mac is record owner of the Property"). Nonetheless, the plaintiffs argue that the "purpose of recordation is to protect the rights of bona fide purchasers, creditors, assignees, and others relying upon the indicia of record ownership," *Smart v. Nevins*, 298 A.2d 217, 219 (D.C. 1972), and that they are among the "others" entitled to rely upon the (alleged) fact that Freddie Mac is the recorded owner of the condominium to establish that Bank of America misrepresented its ownership.

19

The recording system is a means of resolving competing claims to title, but a failure to record a sale does not mean that the seller remains the true owner. *See Lumpkins v. CSL Locksmith, LLC*, 911 A.2d 418, 425 (D.C. 2006). "In general, no one is obliged to record anything, and there is no direct penalty if a conveyance goes unrecorded. As between its original parties, an instrument is fully binding whether it is recorded or not." WILLIAM B. STOEBUCK & DALE A. WHITMAN, LAW OF PROPERTY 872 (3d ed. 2000) (footnote omitted); *accord Juergens v. Urban Title Servs., Inc.*, 533 F. Supp. 2d 64, 79 (D.D.C. 2008) (citing *Lumpkins*, 911 A.2d at 425); *Smart*, 298 A.2d at 219 (affirming that "as between grantor and grantee, the failure of the latter to record cannot be viewed as a waiver"); *Munsey Trust Co. v. Alexander, Inc.*, 59 App. D.C. 369, 370 (D.C. Cir. 1930) (holding that a lease "is a perfectly valid conveyance as between the parties to it" even though it was not recorded); *Dulany v. Morse*, 39 App. D.C. 523, 527 (D.C. Cir. 1913) (noting that the then-current recording statute "places no obligation upon the grantee to record a deed or mortgage for his own protection against the grantor or persons with notice"); *Fitzgerald v. Wynne*, 1 App. D.C. 107, 1893 WL 11492, at * 9 (D.C. Cir. Sept. 5, 1893) (rejecting the argument that "the failure to record the deed, as between the parties thereto" deprives the instrument of "operation or effect in passing the interest of the grantors").[4] Trouble arises when the grantee who did not record attempts to assert his title against "'creditors and subsequent bona fide purchasers'" who hold from the grantor; "against those persons 'a deed conveying an interest in real property is not effective . . . unless it is recorded.'" *Lumpkins*, 911 A.2d at 425 (quoting *Clay Props., Inc. v. Wash. Post Co.*, 604 A.2d 890, 894 (D.C. 1992) (en

---

[4] Recording is now mandatory in the District of Columbia, *see* D.C. CODE § 47-1431, but failure to comply with the statute is only punishable by a fine of no more than five hundred dollars, *see id.* § 47-1433(a), (c).

banc)) (alterations in original).  But that is not the trouble here.

Title to property is a legal conclusion that need not be accepted unless supported by factual allegations.  *See Warren*, 353 F.3d at 39; *Browning*, 292 F.3d at 242.  As Bank of America argues, the only factual basis for the plaintiffs' conclusion that the bank fraudulently misrepresented its ownership of the condominium is that the bank claimed to own the property but had not yet recorded its deed when the amended complaint was filed.  But even if this were so, it would not demonstrate that, as between Freddie Mac and Bank of America, Freddie Mac remains the true owner.[5]  Because the plaintiffs do not allege any other fact to support that conclusion, they have not adequately alleged that the bank fraudulently misrepresented its ownership of the property.  That claim will therefore be dismissed.

### E.  D.C. Consumer Protection Procedures Act (Count VII)

The plaintiffs go on to allege that both Freddie Mac and Bank of America violated the District of Columbia Consumer Protection Procedures Act, which makes it an unlawful trade practice to "misrepresent as to a material fact which has a tendency to mislead."  D.C. CODE § 28-3904(e).  To state such a claim, "the plaintiff must allege that the defendant made a material misrepresentation."  *Alicke v. MCI Commc'ns Corp.*, 111 F.3d 909, 912 (D.C. Cir. 1997) (discussing D.C. CODE § 28-3904(e)).  The misrepresentations that the plaintiffs allege are those underpinning their claims of fraud: that Freddie Mac misrepresented its intention to sell the condominium to Ms. Slinski, and that Bank of America misrepresented both its intention to finance that sale and its subsequent ownership of the property.

---

[5] The court notes that Freddie Mac does not argue that it owns the property.

### i. Freddie Mac

Freddie Mac reprises its argument that the complaint does not allege a misrepresentation with the particularity required by Federal Rule of Civil Procedure 9(b). One judge in this district has squarely held that claims under D.C. Code § 28-3904(e) must comply with Rule 9(b) because they are "akin to allegations of fraud," *Witherspoon v. Philip Morris, Inc.*, 964 F. Supp. 455, 464 (D.D.C. 1997) (internal quotation marks omitted), and another has applied that standard both because he found the earlier opinion convincing and because the plaintiffs did not dispute it, *Jefferson v. Collins*, 905 F. Supp. 2d 269, 289 (D.D.C. 2012). If Rule 9(b) applies to this claim (which the court assumes but does not decide) then the contract of sale (as discussed above) establishes the "time, place and content" of the alleged misrepresentation. *Id.* (quoting *United States ex rel. Williams*, 389 F.3d at 1256). But just as the plaintiffs' claim for fraud is barred by its equivalence to their breach of contract claim, their unlawful trade practice claim also suffers from that defect.

The plaintiffs effectively allege an intentional breach of contract—that is, "a breach allegedly accompanied by a bad motive and by deceptive conduct." *Allen v. Yates*, 870 A.2d 39, 49 (D.C. 2005). Under District of Columbia common law, intentional breach is no different than simple breach unless "the breaching party's conduct 'assumes the character of a willful tort,'" *id.* (quoting *Sere v. Grp. Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982)), in which case the claim for breach "merges with" that tort, and punitive damages are allowed, *Sere*, 443 A.2d at 37 (quoting *Brown v. Coates*, 253 F.2d 36, 39 (D.C. Cir. 1958)); *see also Kuwait Airways Corp. v. Am. Sec. Bank N.A.*, 890 F.2d 456, 466 (D.C. Cir. 1989). The Consumer Protection Procedures Act, on the other hand, "affords a panoply of strong remedies, including treble damages, punitive damages and attorneys' fees, to consumers who are victimized by unlawful trade practices."

*Ford v. Chartone, Inc.*, 908 A.2d 72, 80–81 (D.C. 2006) (quoting *District Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 717 (D.C. 2003)); *see* D.C. CODE § 28-3905(k)(2).

To accept the plaintiffs' argument that an intentional breach of contract is punishable as an unlawful trade practice if the breach was intended when the contract was formed—on the theory that the very signing of the contract is then a "misrepresent[ion] as to a material fact which has a tendency to mislead," D.C. CODE § 28-3904(e)—the court would have to conclude that the Consumer Protection Procedures Act has substantially revised the District's common law of contract. The court is not aware of any case addressing that argument, so it must "reason by analogy from D.C. cases," *Workman v. United Methodist Comm. on Relief*, 320 F.3d 259, 262 (D.C. Cir. 2003), and attempt "to achieve the same outcome [it] believe[s] would result if the District of Columbia Court of Appeals considered" the question, *Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (D.C. Cir. 2006); *accord Earle v. District of Columbia*, 707 F.3d 299, 310 (D.C. Cir. 2012). Because the ban on unlawful trade practices and the accompanying remedies are of long standing, *see* D.C. CODE §§ 28-3904(e), 3905(k)(1) (1981), and the D.C. Court of Appeals has repeatedly re-affirmed its rule that punitive damages are only available for the subset of intentional breaches of contract in which the breach "assume[s] the character of a willful tort," *see, e.g.*, *Choharis*, 961 A.2d at 1090; *Allen*, 870 A.2d at 49; *Bragdon v. Twenty-Five Twelve Assocs. Ltd. P'ship*, 856 A.2d 1165, 1173 (D.C. 2004), with no hint that this common law rule has been amended by statute, the court predicts that the D.C. Court of Appeals would reject the plaintiffs' argument. The court concludes that an intentional breach of contract is not punishable as an unlawful trade practice under the Consumer Protection Procedures Act simply because the breach was intended when the contract was formed. It will therefore dismiss that statutory claim against Freddie Mac.

### ii. Bank of America

In its turn, Bank of America argues that the plaintiffs' allegations that the bank misrepresented both its intention to provide a mortgage and its subsequent ownership of the property do not support an unlawful trade practice claim, because those allegations are not supported by any well-pled facts. The plaintiffs first respond that "[t]he fraudulent nature of th[e] representation [that the bank would provide financing] is supported by the fact that [Ms. Slinski] was conditionally approved for financing on three separate occasions, leading her to believe that, eventually, the financing would be approved given that the conditions that she was required to comply with were minimal." Pls.' Opp. [Dkt. # 32], at 13–14. They also point to "[t]he prolonged nature of the loan process" which they argue "suggests that [Bank of America] did not have the intent to provide financing." *Id.* at 14. But those allegations contain no misrepresentation, which they must to survive this motion. *See Alicke*, 111 F.3d at 912. Rather, the plaintiffs state that the bank truthfully represented that Ms. Slinski was conditionally approved for a mortgage, from which she wrongly concluded that she would eventually receive final approval. Neither that conclusion nor the unexpectedly "prolonged nature of the loan process" is an actionable misrepresentation under D.C. Code § 28-3904(e).

And, as discussed above, the only basis for the plaintiffs' allegation that the bank misrepresented its ownership of the property is the fact that the bank had not yet recorded its deed. But that fact does not support the conclusion that Freddie Mac in fact continued to own the property nor that Bank of America engaged in an unlawful trade practice by claiming that the bank owned it instead. Both Consumer Protection Procedures Act claims against Bank of America will be dismissed.

**F. Fraud in the Inducement (Count VIII)**

The plaintiffs allege that Freddie Mac fraudently induced Ms. Slinski to sign the contract of sale by offering a below-market price when it had no intention to sell the property, and that Bank of America is responsible for the acts of its agent. As discussed earlier, the plaintiffs have not alleged that Freddie Mac committed any fraud separate from its alleged breach of contract, nor have they adequately alleged that it was acting as an agent for Bank of America. The court will therefore dismiss the fraudulent inducement claims against both Bank of America and Freddie Mac.

**G. Conversion (Count VI)**

The plaintiffs next allege that Freddie Mac and Smith Realty converted Ms. Slinski's $20,000 deposit by placing it in Freddie Mac's control and not in escrow. Freddie Mac notes that, "[u]nder D.C. law, an action for conversion is recognized only when a defendant has unlawfully exercised 'ownership, dominion or control over the personal property of another in denial or repudiation of his rights thereto.'" *Kaempe*, 367 F.3d at 964 (quoting *Shea v. Fridley*, 123 A.2d 358, 361 (D.C. 1956)); *accord Bucheit v. Palestine Liberation Org.*, 388 F.3d 346, 349 (D.C. Cir. 2004) (quoting *Duggan v. Keto*, 554 A.2d 1126, 1137 (D.C. 1989)). "[W]here the defendant's initial possession is lawful, the settled rule is that in the absence of other facts and circumstances independently establishing conversion, a demand for its return is necessary to render his possession unlawful and to show its adverse nature." *Shea*, 123 A.2d at 361; *accord Johnson v. McCool*, 808 F. Supp. 2d 304, 308 (D.D.C. 2011); *Furash & Co., Inc. v. McClave*, 130 F. Supp. 2d 48, 58 (D.D.C. 2001). The plaintiffs have not alleged any "other facts and circumstances independently establishing conversion," and they concede that they have not demanded the return of Ms. Slinski's deposit (the initial possession of which was lawful). The

conversion claim against Freddie Mac will therefore be dismissed.

### H.  Tenant Opportunity to Purchase Act (Count IX)

Under the District of Columbia Tenant Opportunity to Purchase Act, "an owner of a rental housing accommodation who wishes to sell the property must first 'give the tenant an opportunity to purchase the accommodation at a price and terms which represent a bona fide offer of sale.'" *Tippett v. Daly*, 10 A.3d 1123, 1125 (D.C. 2010) (en banc) (quoting D.C. CODE § 42-3404.02(a) (2001)).  "To fulfill this requirement, the owner must 'provide each tenant . . . a written copy of the offer of sale,'" *id.* at 1125–26 (quoting D.C. CODE § 42-3404.03 (2001)), and then "bargain in good faith" if a tenant wishes to purchase the property, *Allman v. Snyder*, 888 A.2d 1161, 1166 (D.C. 2005) (quoting D.C. CODE § 42-3404.05(a)).  The plaintiffs allege that Ms. Slinski has not received a written offer of sale since October 2010 (when Smith Realty provided her with an offer on behalf of Freddie Mac, *see* Am. Compl. ¶ 24) and that, by asking for a substantially higher sale price than Freddie Mac demanded, Bank of America has failed to bargain in good faith.

Freddie Mac argues that the plaintiffs have not alleged that it did or failed to do anything that would violate the Tenant Opportunity to Purchase Act, and that no claim can be premised on the rejected theory that Freddie Mac was acting as an agent for Bank of America.  In response, the plaintiffs merely reassert that theory.  Their claim against Freddie Mac will therefore be dismissed.

Bank of America argues that because it has not yet sold the condominium, no Tenant Opportunity to Purchase Act claim against the bank has yet ripened.  The plaintiffs respond that Ms. Slinski was owed "a bona fide offer of sale" before the bank "issue[d] a notice of intent to recover possession" of the property.  D.C. CODE § 42-3404.02(a); *see* Am. Compl. ¶ 52 (alleging

notice of eviction).  They have misread that provision, which states in full:

> Before an owner of a housing accommodation may sell the accommodation, or issue a notice of intent to recover possession, or notice to vacate, *for purposes of demolition or discontinuance of housing use*, the owner shall give the tenant an opportunity to purchase the accommodation at a price and terms which represent a bona fide offer of sale.

D.C. CODE § 42-3404.02(a) (emphasis added).  The D.C. Court of Appeals has recently concluded that the drafting history of this provision "establishes to our satisfaction that the phrasing and punctuation of D.C. Code § 42-3404.02(a) came about because the Council intended to make it clear that only notices of intent to recover possession 'for purposes of demolition or discontinuance of housing use' (and not notices of intent to recover possession for other purposes . . . ) would trigger the tenant's opportunity to purchase." *Richman Towers Tenants Ass'n, Inc. v. Richman Towers LLC*, 17 A.3d 590, 614 (D.C. 2011).

Because the plaintiffs do not allege that Ms. Slinski has received "a notice of intent to recover possession, or notice to vacate, for purposes of demolition or discontinuance of housing use," D.C. CODE § 42-3404.02(a), the eviction notice that she allegedly received cannot support a Tenant Opportunity to Purchase Act claim, and that claim will be dismissed.

### I.  Declaratory Judgment

Finally, the plaintiffs seek a declaratory judgment establishing whether Freddie Mac or Bank of America owns the property.  Both defendants ask that the petition be denied on the grounds that a declaratory judgment would not "finally settle the controversy between the parties." *Swish Mktg., Inc. v. FTC*, 669 F. Supp. 2d 72, 76 (D.D.C. 2009) (quoting *Hanes Corp. v. Millard*, 531 F.2d 585, 591 n.4 (D.C. Cir. 1976)).  The Declaratory Judgment Act, 28 U.S.C. § 2201(a), "gives courts discretion to determine 'whether and when to entertain an action,'" *Swish*, 669 F. Supp. 2d at 76 (quoting *Wilton v. Seven Falls*, 515 U.S. 277, 282 (1995)).  The

27

plaintiffs here ask the court to determine which of two third parties owns a property in which the plaintiffs do not claim an ownership interest themselves. The court has significant doubts that this presents "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Md. Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). The court therefore denies the plaintiffs' request for a declaratory judgment. *See Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1020 (D.C. Cir. 1991) ("Where it is uncertain that declaratory relief will benefit the party alleging injury, the court will normally refrain from exercising its equitable powers.").

## IV. CONCLUSION

For the reasons set forth above, the court will grant the defendants' motions to dismiss in significant part. Sarah Slinski's claim against Freddie Mac for one thousand dollars in damages survives its motion, as does the plaintiffs' tortious interference with contract claim against Bank of America. All other claims will be dismissed, except those brought against Smith Realty, which has not yet been served.

Rudolph Contreras
United States District Judge

Date: September 30, 2013